**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** _____ | **MDL 2724 16-MD-2724 HON. CYNTHIA M. RUFE** |
| **IN RE:  LEVOTHYROXINE CASES** _____ | **LEAD CASE: 16-LV-27240 END-PAYER CASE: 16-LV-27242** |
| **THIS DOCUMENT RELATES TO:** *ALL END-PAYER ACTIONS* _____ | **JURY TRIAL DEMANDED** |
| LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.; SELF-INSURED SCHOOLS OF CALIFORNIA; and UNITE HERE HEALTH, on behalf of themselves and all others similarly situated,  Plaintiffs,  v.  LANNETT COMPANY, INC.; MYLAN INC.; MYLAN PHARMACEUTICALS, INC; and SANDOZ, INC.,  Defendants. | |

**CONSOLIDATED AMENDED END-PAYER CLASS ACTION COMPLAINT**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ............................................................................... 1

II.     ONGOING FEDERAL AND STATE INVESTIGATIONS ............................... 5

III.    JURISDICTION AND VENUE ...................................................................... 10

IV.     PLAINTIFFS ................................................................................................. 11

V.      DEFENDANTS ............................................................................................. 14

VI.     CO-CONSPIRATORS .................................................................................... 15

VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE ............... 15

VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY ........................... 16

        A.      Generic Drugs Are Commodity Products ........................................... 16

        B.      Pricing in the U.S. Prescription Drug Industry .................................. 19

IX.     THE GENERIC LEVOTHYROXINE CONSPIRACY .................................. 22

        A.      Congressional Responses to Generic Drug Price Increases ................. 22

        B.      The Generic Levothyroxine Market .................................................... 23

        C.      Generic Levothyroxine Price Increases .............................................. 25

        D.      Defendants' Statements Suggesting Collusion ................................... 63

        E.      Defendants' Conspiracy ..................................................................... 66

        F.      Defendants' Concerted Efforts to Increase Prices for Generic
                Levothyroxine Yielded Supracompetitive Profits ............................... 79

        G.      Factors Increasing the Market's Susceptibility to Collusion ............... 81

                1.      Industry Concentration ........................................................... 81

                2.      Barriers to Entry .................................................................... 82

                3.      Demand Inelasticity ............................................................... 83

                4.      Lack of Substitutes ................................................................ 84

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**TABLE OF CONTENTS**
**(continued)**

**Page**

5.      Standardized Product with High Degree of Interchangeability ............... 84

6.      Inter-competitor Contacts and Communications ..................................... 85

X.      THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .......... 93

A.      The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy........................ 93

B.      Fraudulent Concealment Tolled the Statutes of Limitations ............................... 94

1.      Active Concealment of the Conspiracy .................................... 95

2.      Plaintiffs Exercised Reasonable Diligence ............................... 97

XI.     CONTINUING VIOLATIONS ................................................................... 98

XII.    DEFENDANTS' ANTITRUST VIOLATIONS.............................................. 98

XIII.   CLASS ACTION ALLEGATIONS ............................................................ 100

XIV.    CAUSES OF ACTION ........................................................................... 104

FIRST COUNT:  Violation of Sections 1 and 3 of the Sherman Act (on behalf of Plaintiffs and the Nationwide Class)................................................................. 104

SECOND COUNT:  Violation of State Antitrust Statutes (on behalf of Plaintiffs and the Damages Class) ....................................................................... 106

THIRD COUNT:  Violation of State Consumer Protection Statutes (on behalf of Plaintiffs and the Damages Class) .................................................................. 128

FOURTH COUNT:  Unjust Enrichment (on behalf of Plaintiffs and the Damages Class).......................................................................................... 164

XV.     PRAYER FOR RELIEF ......................................................................... 188

XVI.    JURY DEMAND .................................................................................. 190

ii

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## I.     <u>NATURE OF THE ACTION</u>

1.      This suit brings claims on behalf of indirect purchasers ("End-Payers" or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic levothyroxine sodium 0.025, 0.05, 0.088, 0.1, 0.112, 0.125, 0.137, 0.15, 0.175, 0.2, and 0.3mg tablets ("Levothyroxine").

2.      Levothyroxine is the primary treatment for hypothyroidism.  Hypothyroidism is a condition in which the thyroid gland fails to produce sufficient levels of thyroid hormone.  Its symptoms include fatigue, weakness, weight gain, muscle cramps, depression, and memory loss.  Untreated hypothyroidism may lead to obesity, infertility, heart disease, and other health problems.  The World Health Organization includes Levothyroxine on its list of essential medicines necessary to meet the minimum needs of even a basic health care system.  Levothyroxine has been manufactured and distributed widely since at least the 1950s, and it is among the most widely-prescribed medications in the United States (in 2014, for instance, Levothyroxine was the most prescribed drug in the United States, with 119.9 million dispensed prescriptions).  Any patent protection on Levothyroxine has long-since expired.

3.      For years, competition among sellers of generic Levothyroxine kept prices stable, at low levels.  But starting in September 2013, Defendants, who dominate the market for Levothyroxine, abruptly and inexplicably raised prices.  The price increases were extreme and unprecedented:  prices for Levothyroxine increased as much as ███████ higher than August 2013 prices.  Prices remain at elevated levels today.

4.      Defendants' unlawful and anticompetitive conduct in the Levothyroxine market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

5.      The price increases imposed by Defendant manufacturers of generic Levothyroxine cannot be explained by supply shortages or any other market feature or shock. Nor were they the result of unilateral business decisions.  Instead, the significant increases in the prices of Levothyroxine were the result of an illegal agreement among Defendants to fix prices.

6.      The market for Levothyroxine was highly conducive to collusion, as it was controlled almost exclusively by the Defendants and is subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements.   Because Levothyroxine is a medically necessary product for which reasonable substitutes are not available and demand is inelastic, Defendants were able to raise prices in concert without suffering corresponding losses in sales volume.  Federal regulations require Defendants' Levothyroxine products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another.   They are therefore interchangeable commodity products.   Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

7.      Because purchasers choose whose Levothyroxine product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same.

8.      Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on Levothyroxine prices and allocate markets and customers for Levothyroxine.   As alleged below, Defendants implemented their conspiracy through numerous secret meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association  (now the Association for Accessible Medicines)

2

("GPhA"), the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association (now the Healthcare Distribution Alliance) ("HDMA"), and Efficient Collaborative Retail Marketing ("ECRM"), among others.

9.      Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Levothyroxine—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

10.      An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of doxycycline hyclate and glyburide.  But DOJ has made clear that its "investigation is ongoing"[1] and the evidence uncovered during the course of its investigation into those drugs also "implicates . . . a significant number of the Defendants . . . [and] a significant number of the drugs at issue" in this Multidistrict Litigation.[2]

11.      The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six companies.  Way beyond. . . .  We're learning new things every day."[3]  There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and

---

[1] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[2] Intervenor United States' Motion to Stay Discovery at 1–2 (May 1, 2017), ECF No. 279.

[3] *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, Kaiser Health News (Dec. 21, 2016), *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[4]

12.     Manufacturers of generic Levothyroxine are implicated in these ongoing investigations; all three of the Defendants named here—Lannett Company, Inc., Mylan Inc., and Sandoz, Inc.—have received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations.

13.     As End-Payers in the chain of pharmaceutical distribution, Plaintiffs bear the brunt of Defendants' illegal conduct.  Plaintiffs have paid many millions of dollars more than they would have in a competitive market for generic Levothyroxine.

14.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Levothyroxine products manufactured by any Defendant, other than for resale, from September 2013 to the present (the "Class Period"), and (b) a damages class of persons or entities in the states and territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Levothyroxine products manufactured by any Defendant, other than for resale, from September 2013 to the present.

---

[4] Press Release, *Conn. AG, Conn. Leads 20 State Coal. Filing Fed. Antitrust Lawsuit against Heritage Pharm., other Generic Drug Cos.* (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## II.   ONGOING FEDERAL AND STATE INVESTIGATIONS

15.     Now in its third year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit.  On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President).  The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[5]

16.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[6]  Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[7]  As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation.  More criminal charges and guilty pleas are expected to follow.[8]

---

[5] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016), ECF No. 1; Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016), ECF No. 1.

[6] *See* Tr. of Plea Hr'g, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017), ECF No. 24; *see also* Tr. of Plea Hr'g, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017), ECF No. 24.

[7] Press Release, DOJ, *Former Top Generic Pharm. Execs. Charged with Price-Fixing, Bid-Rigging and Customer Allocation Conspiracies* (Dec. 14, 2016), *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[8] *See, e.g.*, Eric Kroh, *Generic Drug Price-Fixing Suits Just Tip Of The Iceberg*, Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

17.     Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader.  The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[9]  Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[10]

18.     According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever.  *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-02311 (E.D. Mich.).  As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[11]

19.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least seventeen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva

---

[9] David McLaughlin & Caroline Chen, *U.S. Charges in Generic-Drug Probe to Be Filed by Year-End*, Bloomberg (Nov. 3, 2016), *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[10] PaRR Report, *DoJ Believes Collusion over Generic Drug Prices Widespread* (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[11] *Id.*

6

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").  And as recently as August 10, 2017, Pfizer, Inc. ("Pfizer") also disclosed that DOJ is investigating its Greenstone generics business.[12]

20.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  DOJ does not empanel grand juries lightly.  The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division.  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[13]

21.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[14]

---

[12] Further discussion of these generic drug manufacturers and their receipt of subpoenas or other inquiries from DOJ is included *infra* at ¶ 175.

[13] DOJ, Antitrust Division Manual at III-81–83 (5th ed. 2015), *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

[14] Mark Rosman & Seth Silber, *DOJ's Investigation Into Generic Pharma Pricing Is Unusual*, Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

22.     Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[15]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[16]

23.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs.  Now joined by the Attorneys General of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price-fixing and customer allocation.[17]  Although the States' present complaint focuses on two drugs (doxycycline hyclate delayed release and glyburide), the States make clear that they have

---

[15] Richard Vanderford, *Generic Pharma Investigation Still Broad, Prosecutor Says*, mLex (Feb. 21, 2017).

[16] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* at 6, 16 (updated Jan. 26, 2017), *available a*t https://www.justice.gov/atr/page/file/926521/download.

[17] On August 3, 2017, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") issued an order directing that the State AG case be transferred to this Court and coordinated as part of MDL 2724 (ECF No. 417).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

"uncovered wide-ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[18]

24.     The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[19]   The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications.    "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."   This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[20]

25.     The criminal informations and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg.   The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[21]   Plaintiffs do not yet have access to all of the information available to the government enforcement agencies.   What is known is that in light of all the evidence described above, the large and unprecedented price increases for

---

[18] *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn. Mar. 1, 2017), ECF No. 168 at ¶ 9 (State AG Complaint), *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

[19] Mark Pazniokus, *How a small-state AG's office plays in the big leagues*, CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.

[20] State AG Complaint ¶ 7.

[21] State AG Complaint ¶ 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic Levothyroxine cannot be explained by normal, competitive market forces.   The explanation is collusion.

### III.     JURISDICTION AND VENUE

26.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

27.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

28.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26).  In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

29.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.  Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here.  According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district

where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[22]

30.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Levothyroxine throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## IV.     PLAINTIFFS

31.     Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. (collectively, "BCBS-LA") is headquartered in Baton Rouge, Louisiana, and is Louisiana's oldest and largest domestic health insurer, with over 1 million members.  During the Class Period, BCBS-LA indirectly purchased, paid, and/or provided reimbursement on behalf of its members for some or all of the purchase price for one or more generic Levothyroxine prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan,

---

[22] DOJ, Antitrust Division Manual at III-83.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, the District of Columbia and Puerto Rico, thereby suffering injury to its business and property.  During the Class Period, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by reason of the violations of law alleged herein.  BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

32.      Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public school district members.  It is headquartered in Bakersfield, California.   It provides health benefit plans to approximately 300,000 members who reside in numerous locations in the United States.   During the Class Period, SISC indirectly purchased and paid for some or all of the purchase price for one or more generic Levothyroxine prescriptions, other than for resale, manufactured by the Defendants.  SISC made such payments and/or reimbursements in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, Wyoming

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and Virgin Islands, thereby suffering injury to its business and property.  During the Class Period, SISC paid and reimbursed more for these products more than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, SISC was injured in its business or property by reason of the violations of law alleged herein.  SISC intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

33.     Plaintiff Unite Here Health ("UHH") is a multi-employer trust fund composed of union and employer representatives, whose mission is to provide health benefits that offer high quality, affordable healthcare to its participants at a better value and with a better service than is otherwise available in the market.  Headquartered in Aurora, Illinois, UHH has served union workers in the hospitality, food service, and gaming industries for the past several decades. During the Class Period, UHH indirectly purchased and paid for some or all of the purchase price for one or more generic Levothyroxine prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Arizona, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Vermont, Virginia, Washington, West Virginia, and Wisconsin.  During the Class Period, UHH purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, Plaintiff UHH was injured in its business or property by reason of the violations of

13

law alleged herein.  UHH intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## V.     DEFENDANTS

34.     Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.  Lannett is registered with the Pennsylvania Department of State as a foreign corporation.  During the Class Period, Lannett sold generic Levothyroxine to customers in this District and other locations in the United States.

35.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

36.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  It is a subsidiary of Mylan Inc. Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

37.     Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  Unless addressed individually, Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan."  During the Class Period, Mylan sold generic Levothyroxine to customers in this District and other locations in the United States.

38.     Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business in Princeton, New Jersey.  Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland.  Sandoz is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in

14

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pennsylvania. During the Class Period, Sandoz sold generic Levothyroxine in this District and other locations in the United States.

## VI.   CO-CONSPIRATORS

39.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein.  In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

40.     During the Class Period, Defendants sold and distributed generic Levothyroxine in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

41.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Levothyroxine, took place within the United States and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

42.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic Levothyroxine to Plaintiffs inside each respective state and territory.  The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.   Generic Drugs Are Commodity Products

43.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[23]  "In 2015, generic drug sales in the United States were estimated at $74.5 billion."[24]

44.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[25]  Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[26]

45.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[27]  And that may be conservative.  According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[28]

---

[23] GPhA, *Generic Drug Savings in the U.S.* at 1 (2015) ("GPhA Report"), *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[24] Press Release, Connecticut AG (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[25] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G (last visited Aug. 9, 2017).

[26] *Id.*

[27] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* at 8–9 (Sep. 15, 2010), *available at* https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/09-15-prescriptiondrugs.pdf.

[28] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* at 8 (Jan. 2010), *available at* https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Mature generic markets—like that of Levothyroxine—typically have several manufacturers that compete for sales, hence keeping prices in check.

46.    Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[29]

47.    The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585).  The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs.  Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

48.    Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

49.    Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature.  As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of

---

drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf.

[29] GPhA Report at 1.

17

price."[30]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

50.     It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:



**Generic Competition and Drug Prices**

Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

51.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.  A recent

---

[30] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* at 17 (Aug. 2011), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base.  Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[31]

52.     When there are multiple generic manufacturers in an established generic market—as with generic Levothyroxine—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.     Pricing in the U.S. Prescription Drug Industry**

53.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

54.     Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services

---

[31] GAO, GAO-16-706, Report to Congressional Requesters, Generic Drugs Under Medicare at 23 (Aug. 12, 2016) ("GAO Report"), *available at* http://www.gao.gov/assets/680/679022.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

("CMS") survey of National Average Drug Acquisition Cost ("NADAC"). NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[32] "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies."[33] In effect, NADAC is "a single national average."[34] Thus, NADAC is one way to track general price trends in the marketplace.

55.     While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific. Drug manufacturers typically report benchmarks-like WACs (Wholesale Acquisition Costs)-for their drugs, which are then published in compendia used by participants in the pharmaceutical industry. The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price. Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[35]

56.     The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC. The end-payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee. Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain

---

[32] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[33] *Id.* at 15.

[34] *Id.*

[35] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry. And QuintilesIMS's National Sales Perspectives ("NSP") is another measure of manufacturer specific pricing. NSP data "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets. IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

20

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmacies to acquire the drugs.  As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

57.     To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices-Maximum Allowable Costs ("MACs")-that set the amounts they will pay pharmacies for some generic drugs.  A MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

58.     Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug.  So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices.  A pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

59.     Drug purchasers always should have an incentive to buy the least expensive available drug.  Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *e.g.*, if they are conspiring.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## IX.   THE GENERIC LEVOTHYROXINE CONSPIRACY

### A.   Congressional Responses to Generic Drug Price Increases

60.   In addition to the investigations by DOJ and the Connecticut AG, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals.  These concerns were prompted by the very real hardship suffered by end-payers as a result of the unprecedented price increases.

61.   In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of 10 drugs that had experienced extraordinary price increases.  Six of those drugs are now the subject of complaints in this MDL, and two of the defendants in this action—Lannett and Mylan—received letters from Senator Sanders and Representative Cummings.[36]  In November 2014, Senator Sanders conducted a hearing entitled, "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing").  Various witnesses discussed the price hikes for generic drugs, but none of the industry executives who were invited to testify—including Arthur P. Bedrosian, President and Chief Executive Officer of Defendant Lannett—appeared.[37]

62.   Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and

---

[36] Sen. Sanders,  Press Release (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[37] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Medicaid programs.  The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far out-stripped inflation.[38]

63.    In response to another Congressional request—this one from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[39]  The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions.[40]  And this was the case for most generics.  But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[41]

## B.    The Generic Levothyroxine Market

64.    Levothyroxine is sold throughout the United States and its territories.  The market for generic Levothyroxine is mature and Defendants that operate in that market can only gain market share by competing on price.  In 2014 alone, Defendants' total revenue from sales of generic Levothyroxine products was approximately ▮▮▮▮▮▮.[42]  This compares to just ▮▮▮▮

▮▮▮▮ n 2012, a year before the price-fixing conspiracy began.

65.    Levothyroxine replaces a hormone (thyroxine) that the body normally produces in the thyroid gland.  Levothyroxine is a synthetic form of the thyroid hormone T4.  Levothyroxine

---

[38] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

[39] GAO Report.

[40] *Id.* at 23-25.

[41] *Id.* at 1 & Appendix III.

[42] Revenue, unit sales, and effective prices are obtained from QuintilesIMS Inc. ("IMS Health").  IMS Health is the largest vendor of physician prescribing data in the United States and is widely relied upon in the generic pharmaceutical industry and elsewhere.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

is the preferred treatment for hypothyroidism, a condition that afflicts approximately 10 million Americans.   Treatment typically consists of daily consumption of an oral tablet form of Levothyroxine, with the dosage determined by factors such as body weight, age, pregnancy status, and other factors.   Patients diagnosed with hypothyroidism will often consume a daily dosage of Levothyroxine for the rest of their lives.   Levothyroxine also treats goiters, nodular thyroid disease, thyroid cancer, and myxedema coma.   The World Health Organization includes Levothyroxine on its core list of essential medicines.   That list includes medicines necessary to meet the minimum needs for a basic health-care system.

66.     Levothyroxine was introduced in the 1950s and was marketed by many manufacturers (for instance, in 1997, there were 37 manufacturers) as a grandfathered-in, if technically unapproved, drug.   In 1997, the United States Food and Drug Administration ("FDA") determined that Levothyroxine oral tablets were actually new drugs for which drug applications needed to be submitted and approved.   The deadline for obtaining approval was August 14, 2001.   Nine sponsors had submitted new drug applications by then, but only two obtained approval before the deadline.   In order to allow time for manufacturers of the approved products to ramp up production and for patients to switch drug products, the FDA permitted manufacturers that had submitted an application before that date but had not yet obtained approval to continue to market their unapproved Levothyroxine products for two more years according to a distribution phase-down schedule.   As of March 2003, the FDA had approved six new drug applications for Levothyroxine tablets.

67.     Levothyroxine has historically been available in brand-name and generic versions. In 2004, the FDA approved the substitution of generic Levothyroxine for brand-name Levothyroxine.   However, bioequivalence as between brand and generic Levothyroxine is

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

controversial, and some medical organizations recommend that patients be started and maintained on either brand or generic Levothyroxine, and not switched from one to the other without repeated testing to insure that hormone levels remain within normal ranges.

68.     At all relevant times, Defendants had substantial market power with respect to generic Levothyroxine.  Defendants exercised this power to maintain supracompetitive prices for Levothyroxine without losing so many sales as to make the elevated price unprofitable.

69.     During the Class Period, the Defendants controlled the entire generic Levothyroxine market with approximately a ██████ share.

70.     Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for generic Levothyroxine.

**C.     Generic Levothyroxine Price Increases**

71.     Before the Class Period, Defendants' effective prices for generic Levothyroxine products remained stable for years, as is typical in a mature market.  But, as illustrated by the charts below, Defendants inexplicably and sharply increased their effective prices for generic Levothyroxine beginning in September 2013.

72.     Data showing Medicaid reimbursements—the amounts that Medicaid paid to cover its beneficiaries' prescription drug purchases—provides prices by manufacturer and demonstrates that all three Defendants increased their prices for generic Levothyroxine in very similar fashion over time.  The following charts display the per-unit amounts that Medicaid has reimbursed for its beneficiaries' purchases of Defendants generic Levothyroxine products.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



73.   The following charts, based on National Sales Perspectives ("NSP") data obtained from IMS Health, tell a similar story:  [charts to be redacted]



29





30





31



32





33



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





35

74. **Sandoz**: For more than two years before the Class Period began, the average effective price per unit of its products was as follows, and by August 2013 its effective prices ███████████████████:[43]

| Product | Pre-Class Average | Price Aug. 2013 |
|---|---|---|
| TAB .025 MG | ██ | ██ |
| TAB .05 MG | ██ | ██ |
| TAB .075 MG | ██ | ██ |
| TAB .088 MG | ██ | ██ |
| TAB .112 MG | ██ | ██ |
| TAB .125 MG | ██ | ██ |
| TAB .137 MG | ██ | ██ |
| TAB .15 MG | ██ | ██ |
| TAB .175 MG | ██ | ██ |
| TAB .1 MG | ██ | ██ |
| TAB .2 MG | ██ | ██ |
| TAB .3 MG | ██ | ██ |

75. But in September 2013, Sandoz ███████████████████████

---

[43] Plaintiffs calculate Defendants' effective prices based on IMS Health's National Sales Perspectives (NSP) data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices[.]"  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.  Effective prices are calculated to multiple decimals.  For ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precisely calculated price.

36

| Product | Price Aug. 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| TAB .025 MG | ■ | ■ | ■ | ■ |
| TAB .05 MG | ■ | ■ | ■ | ■ |
| TAB .075 MG | ■ | ■ | ■ | ■ |
| TAB .088 MG | ■ | ■ | ■ | ■ |
| TAB .112 MG | ■ | ■ | ■ | ■ |
| TAB .125 MG | ■ | ■ | ■ | ■ |
| TAB .137 MG | ■ | ■ | ■ | ■ |
| TAB .15 MG | ■ | ■ | ■ | ■ |
| TAB .175 MG | ■ | ■ | ■ | ■ |
| TAB .1 MG | ■ | ■ | ■ | ■ |
| TAB .2 MG | ■ | ■ | ■ | ■ |
| TAB .3 MG | ■ | ■ | ■ | ■ |

76.    In the ensuing months, Sandoz's effective prices for generic Levothyroxine

products ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB .025 MG | ■ | ■ | ■ |
| TAB .05 MG | ■ | ■ | ■ |
| TAB .075 MG | ■ | ■ | ■ |
| TAB .088 MG | ■ | ■ | ■ |
| TAB .112 MG | ■ | ■ | ■ |
| TAB .125 MG | ■ | ■ | ■ |

37

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB .137 MG | ███ | ███ | ███ |
| TAB .15 MG | ███ | ███ | ███ |
| TAB .175 MG | ███ | ███ | ███ |
| TAB .1 MG | ███ | ███ | ███ |
| TAB .2 MG | ███ | ███ | ███ |
| TAB .3 MG | ███ | ███ | ███ |

77.   Sandoz's effective prices for generic Levothyroxine products ███

████████████████████████████

████████████████████████████

███

| Product | Price Aug. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB .025MG | ███ | ███ | ███ |
| TAB .05MG | ███ | ███ | ███ |
| TAB .075MG | ███ | ███ | ███ |
| TAB .088MG | ███ | ███ | ███ |
| TAB .112MG | ███ | ███ | ███ |
| TAB .125MG | ███ | ███ | ███ |
| TAB .137MG | ███ | ███ | ███ |
| TAB .15MG | ███ | ███ | ███ |
| TAB .175MG | ███ | ███ | ███ |
| TAB .1MG | ███ | ███ | ███ |
| TAB .2MG | ███ | ███ | ███ |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Price Aug. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB .3MG | ██ | ██ | ██ |

78.   **Mylan:**  For more than two years before the Class Period began, Mylan's average effective prices per unit for its generic Levothyroxine products were as follows, and by August 2013 its effective prices ███████████████████

| Product | Pre-Class Average | Price Aug. 2013 |
|---|---|---|
| TAB .025 MG | ██ | ██ |
| TAB .05 MG | ██ | ██ |
| TAB .075 MG | ██ | ██ |
| TAB .088 MG | $██ | ██ |
| TAB .112 MG | ██ | ██ |
| TAB .125 MG | ██ | ██ |
| TAB .137 MG | ██ | ██ |
| TAB .15 MG | ██ | ██ |
| TAB .175 MG | ██ | ██ |
| TAB .1 MG | ██ | ██ |
| TAB .2 MG | ██ | ██ |
| TAB .3 MG | ██ | ██ |

79.   But in September 2013, Mylan began ██████████████████████████

| Product | Price Aug. 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| TAB .025 MG | ██ | ██ | ██ | ██ |
| TAB .05 MG | ██ | ██ | ██ | ██ |

39

| Product | Price Aug. 2013 | Hike Date | Hike Price | Percentage Increase |
|---------|-----------------|-----------|------------|---------------------|
| TAB .075 MG | ■ | ■ | ■ | ■ |
| TAB .088 MG | ■ | ■ | ■ | ■ |
| TAB .112 MG | ■ | ■ | ■ | ■ |
| TAB .125 MG | ■ | ■ | ■ | ■ |
| TAB .137 MG | ■ | ■ | ■ | ■ |
| TAB .15 MG | ■ | ■ | ■ | ■ |
| TAB .175 MG | ■ | ■ | ■ | ■ |
| TAB .1 MG | ■ | ■ | ■ | ■ |
| TAB .2 MG | ■ | ■ | ■ | ■ |
| TAB .3 MG | ■ | ■ | ■ | ■ |

80.   As with Sandoz, Mylan's effective prices for generic Levothyroxine products

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■

| Product | Price Date | Peak Price | Percentage Increase |
|---------|-----------|------------|---------------------|
| TAB .025 MG | ■ | ■ | ■ |
| TAB .05 MG | ■ | ■ | ■ |
| TAB .075 MG | ■ | ■ | ■ |
| TAB .088 MG | ■ | ■ | ■ |
| TAB .112 MG | ■ | ■ | ■ |
| TAB .125 MG | ■ | ■ | ■ |
| TAB .137 MG | ■ | ■ | ■ |
| TAB .15 MG | ■ | ■ | ■ |

40

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| TAB .175 MG | ███ | ███ | ███ |
| TAB .1 MG | ███ | ███ | ███ |
| TAB .2 MG | ███ | ███ | ███ |
| TAB .3 MG | ███ | ███ | ███ |

81.     Mylan's effective prices for generic Levothyroxine products ███

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

| Product | Price Aug. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB .025 MG | ███ | ███ | ███ |
| TAB .05 MG | ███ | ███ | ███ |
| TAB .075 MG | ███ | ███ | ███ |
| TAB .088 MG | ███ | ███ | ███ |
| TAB .112 MG | ███ | ███ | ███ |
| TAB .125 MG | ███ | ███ | ███ |
| TAB .137 MG | ███ | ███ | ███ |
| TAB .15 MG | ███ | ███ | ███ |
| TAB .175 MG | ███ | ███ | ███ |
| TAB .1 MG | ███ | ███ | ███ |
| TAB .2 MG | ███ | ███ | ███ |
| TAB .3 MG | ███ | ███ | ███ |

41

82.   **Lannett:**   For more than two years before the Class period began, Lannett's average effective prices per unit for its generic Levothyroxine products were as follows, and by August 2013 its effective prices ███████████████████████████████

| Product | Pre-Class Average | Price Aug. 2013 |
|---------|-------------------|-----------------|
| TAB .025 MG | ███ | ███ |
| TAB .05 MG | ███ | ███ |
| TAB .075 MG | ███ | ███ |
| TAB .088 MG | ███ | ███ |
| TAB .112 MG | ███ | ███ |
| TAB .125 MG | ███ | ███ |
| TAB .137 MG | ███ | ███ |
| TAB .15 MG | ███ | ███ |
| TAB .175 MG | $███ | ███ |
| TAB .1 MG | ███ | ███ |
| TAB .2 MG | ███ | ███ |

83.   But in September 2013, Lannett ███████████████████████████████████

███████████████████████████

| Product | Price Aug. 2013 | Hike Date | Hike Price | Percentage Increase |
|---------|-----------------|-----------|------------|---------------------|
| TAB .025 MG | ███ | ███ | ███ | ███ |
| TAB .05 MG | ███ | ███ | ███ | ███ |
| TAB .075 MG | ███ | ███ | ███ | ███ |
| TAB .088 MG | ███ | ███ | ███ | ███ |
| TAB .112 MG | ███ | ███ | ███ | ███ |

42

| Product | Price Aug. 2013 | Hike Date | Hike Price | Percentage Increase |
|---------|-----------------|-----------|------------|---------------------|
| TAB .125 MG | ██ | ██ | ██ | ██ |
| TAB .137 MG | ██ | ██ | ██ | ██ |
| TAB .15 MG | ██ | ██ | ██ | ██ |
| TAB .175 MG | ██ | ██ | ██ | ██ |
| TAB .1 MG | ██ | ██ | ██ | ██ |
| TAB .2 MG | ██ | ██ | ██ | ██ |

84.    Like Sandoz and Mylan, Lannett's effective prices for generic Levothyroxine

██████████████████████████████████████████████████████████████

██████

| Product | Price Date | Peak Price | Percentage Increase |
|---------|-----------|------------|---------------------|
| TAB .025 MG | ██ | ██ | ██ |
| TAB .05 MG | ██ | ██ | ██ |
| TAB .075 MG | ██ | ██ | ██ |
| TAB .088 MG | ██ | ██ | ██ |
| TAB .112 MG | ██ | ██ | ██ |
| TAB .125 MG | ██ | ██ | ██ |
| TAB .137 MG | ██ | ██ | ██ |
| TAB .15 MG | ██ | ██ | ██ |
| TAB .175 MG | ██ | ██ | ██ |
| TAB .1 MG | ██ | ██ | ██ |
| TAB .2 MG | ██ | ██ | ██ |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

85.     Lannett's effective prices for generic Levothyroxine products ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

| Product | Price Aug. 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| TAB .025 MG | ████ | ████ | ████ |
| TAB .05 MG | ████ | ████ | ████ |
| TAB .075 MG | ████ | ████ | ████ |
| TAB .088 MG | ████ | ████ | ████ |
| TAB .112 MG | ████ | ████ | ████ |
| TAB .125 MG | ████ | ████ | ████ |
| TAB .137 MG | ████ | ████ | ████ |
| TAB .15 MG | ████ | ████ | ████ |
| TAB .175 MG | ████ | ████ | ████ |
| TAB .1 MG | ████ | ████ | ████ |
| TAB .2 MG | ████ | ████ | ████ |

86.     Defendants' price increases for generic Levothyroxine products coincide with increases reported in CMS NADAC data.

87.     The following charts show Defendants' dramatic price increases for generic Levothyroxine products beginning in late 2013:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



45

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



Source: NADAC Price Data



Source: NADAC Price

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



Source: NADAC Price Data



Source: NADAC Price Data

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



Source: NADAC Price Data



Source: NADAC Price Data

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER





PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

88.     The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to End-Payers.  A manufacturer first sells the drug to direct purchaser wholesalers based on the listed wholesale acquisition cost ("WAC"), minus applicable discounts.  Wholesalers then sell the drug to pharmacies, which in turn sell the drugs to End-Payers.  Thus the WAC serves as the benchmark for prices throughout the distribution chain.  Corresponding increases in Levothyroxine's transactional prices (discussed above) demonstrate that increased WAC prices (discussed below) translate to increases in the prices paid by End-Payers.

89.     The following tables demonstrate that Defendants set matching WACs for their generic Levothyroxine products in quick succession at or shortly before the start of the Class Period, even though it meant increasing their benchmark prices by as much as 131%:[44]

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 1,000 ct. .025 mg tab | Mylan | 00378-1800-10 | $0.16 | $0.24 | 9-Aug-13 | 45% |
| 1,000 ct. .025 mg tab | Lannett | 00527-1341-10 | $0.16 | $0.24 | 14-Aug-13 | 45% |
| 100 ct. .025 mg tab | Lannett | 00527-1341-01 | $0.16 | $0.24 | 14-Aug-13 | 46% |
| 90 ct. .025 mg tab | Sandoz | 00781-5180-92 | $0.11 | $0.24 | 13-Sep-13 | 119% |
| 1,000 ct. .025 mg tab | Sandoz | 00781-5180-10 | $0.11 | $0.24 | 13-Sep-13 | 119% |

---

[44] For ease of reference, WAC prices are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

52

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. 05 mg tab | Mylan | 00378-1803-10 | $0.18 | $0.27 | 9-Aug-13 | 45% |
| 100 ct. .05 mg tab | Lannett | 00527-1342-01 | $0.18 | $0.27 | 14-Aug-13 | 46% |
| 1,000 ct. .05 mg tab | Lannett | 00527-1342-10 | $0.18 | $0.27 | 14-Aug-13 | 46% |
| 1,000 ct. .05 mg tab | Sandoz | 00781-5181-10 | $0.12 | $0.27 | 13-Sep-13 | 120% |
| 90 ct. .05 mg tab | Sandoz | 00781-5181-92 | $0.12 | $0.27 | 13-Sep-13 | 120% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .075 mg tab | Mylan | 00378-1805-10 | $0.20 | $0.30 | 9-Aug-13 | 45% |
| 1,000 ct. .075 mg tab | Lannett | 00527-1343-10 | $0.20 | $0.30 | 14-Aug-13 | 45% |
| 100 ct. .075 mg tab | Lannett | 00527-1343-01 | $0.20 | $0.30 | 14-Aug-13 | 46% |
| 1,000 ct. .075 mg tab | Sandoz | 00781-5182-10 | $0.14 | $0.30 | 13-Sep-13 | 115% |
| 90 ct. .075 mg tab | Sandoz | 00781-5182-92 | $0.14 | $0.30 | 13-Sep-13 | 115% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .088 mg tab | Mylan | 00378-1807-10 | $0.21 | $0.30 | 9-Aug-13 | 45% |

53

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct. .088 mg tab | Lannett | 00527-1344-01 | $0.21 | $0.30 | 14-Aug-13 | 46% |
| 1,000 ct. .088 mg tab | Lannett | 00527-1344-10 | $0.21 | $0.30 | 14-Aug-13 | 46% |
| 90 ct. .088 mg tab | Sandoz | 00781-5183-92 | $0.13 | $0.30 | 13-Sep-13 | 131% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .1 mg tab | Mylan | 00378-1809-10 | $0.21 | $0.30 | 9-Aug-13 | 45% |
| 100 ct. .1 mg tab | Lannett | 00527-1345-01 | $0.21 | $0.30 | 14-Aug-13 | 45% |
| 1,000 ct. .1 mg tab | Lannett | 00527-1345-10 | $0.21 | $0.30 | 14-Aug-13 | 45% |
| 90 ct. .1 mg tab | Sandoz | 00781-5184-92 | $0.14 | $0.30 | 13-Sep-13 | 117% |
| 1,000 ct. .1 mg tab | Sandoz | 00781-5184-10 | $0.14 | $0.30 | 13-Sep-13 | 117% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .112 mg tab | Mylan | 00378-1811-10 | $0.24 | $0.35 | 9-Aug-13 | 45% |
| 100 ct. .112 mg tab | Lannett | 00527-1346-01 | $0.24 | $0.35 | 14-Aug-13 | 46% |
| 1,000 ct. .112 mg tab | Lannett | 00527-1346-10 | $0.24 | $0.35 | 14-Aug-13 | 46% |

54

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90 ct. .112 mg tab | Sandoz | 00781-5185-92 | $0.15 | $0.35 | 13-Sep-13 | 128% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .125 mg tab | Mylan | 00378-1813-10 | $0.24 | $0.36 | 9-Aug-13 | 45% |
| 100 ct. .125 mg tab | Lannett | 00527-1347-01 | $0.24 | $0.36 | 14-Aug-13 | 45% |
| 1,000 ct. .125 mg tab | Lannett | 00527-1347-10 | $0.24 | $0.36 | 14-Aug-13 | 46% |
| 1,000 ct. .125 mg tab | Sandoz | 00781-5186-10 | $0.16 | $0.36 | 13-Sep-13 | 129% |
| 90 ct. .125 mg tab | Sandoz | 00781-5186-92 | $0.16 | $0.36 | 13-Sep-13 | 129% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct. .137 mg tab | Lannett | 00527-1638-01 | $0.25 | $0.36 | 14-Aug-13 | 45% |
| 1,000 ct. .137 mg tab | Lannett | 00527-1638-10 | $0.25 | $0.36 | 14-Aug-13 | 45% |
| 90 ct. .137 mg tab | Sandoz | 00781-5191-92 | $0.21 | $0.36 | 13-Sep-13 | 76% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .15 mg tab | Mylan | 00378-1815-10 | $0.25 | $0.37 | 9-Aug-13 | 45% |

55

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .15 mg tab | Lannett | 00527-1349-10 | $0.25 | $0.37 | 14-Aug-13 | 45% |
| 100 ct. 15 mg tab | Lannett | 00527-1349-01 | $0.25 | $0.37 | 14-Aug-13 | 45% |
| 90 ct. .15 mg tab | Sandoz | 00781-5187-92 | $0.16 | $0.37 | 13-Sep-13 | 124% |
| 1,000 ct. .15 mg tab | Sandoz | 00781-5187-10 | $0.16 | $0.37 | 13-Sep-13 | 124% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .175 mg tab | Mylan | 00378-1817-10 | $0.30 | $0.43 | 9-Aug-13 | 45% |
| 100 ct. .175 mg tab | Lannett | 00527-1350-01 | $0.30 | $0.43 | 14-Aug-13 | 45% |
| 1,000 ct. .175 mg tab | Lannett | 00527-1350-10 | $0.30 | $0.43 | 14-Aug-13 | 45% |
| 90 ct. .175 mg tab | Sandoz | 00781-5188-92 | $0.20 | $0.43 | 13-Sep-13 | 114% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .2 mg tab | Mylan | 00378-1819-10 | $0.31 | $0.44 | 9-Aug-13 | 41% |
| 100 ct. .2 mg tab | Lannett | 00527-1351-01 | $0.31 | $0.44 | 14-Aug-13 | 41% |
| 1,000 ct. .2 mg tab | Lannett | 00527-1351-10 | $0.31 | $0.44 | 14-Aug-13 | 41% |

56

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 90 ct. .2 mg tab | Sandoz | 00781-5189-92 | $0.21 | $0.44 | 13-Sep-13 | 104% |

90.     In late April and May 2014, Defendants again raised their WACs for generic Levothyroxine products to matching levels by increasing their benchmark prices approximately another 50%:

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 1,000 ct. .025 mg tab | Mylan | 00378-1800-10 | $0.24 | $0.36 | 25-Apr-14 | 54% |
| 100 ct. .025 mg tab | Lannett | 00527-1341-01 | $0.24 | $0.36 | 28-Apr-14 | 54% |
| 1,000 ct. .025 mg tab | Lannett | 00527-1341-10 | $0.24 | $0.36 | 28-Apr-14 | 54% |
| 1,000 ct. .025 mg tab | Sandoz | 00781-5180-10 | $0.24 | $0.36 | 23-May-14 | 54% |
| 90 ct. .025 mg tab | Sandoz | 00781-5180-92 | $0.24 | $0.36 | 23-May-14 | 55% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 1,000 ct. 05 mg tab | Mylan | 00378-1803-10 | $0.27 | $0.41 | 25-Apr-14 | 54% |
| 100 ct. .05 mg tab | Lannett | 00527-1342-01 | $0.27 | $0.41 | 28-Apr-14 | 55% |
| 1,000 ct. .05 mg tab | Lannett | 00527-1342-10 | $0.27 | $0.41 | 28-Apr-14 | 54% |

57

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .05 mg tab | Sandoz | 00781-5181-10 | $0.27 | $0.41 | 23-May-14 | 54% |
| 90 ct. .05 mg tab | Sandoz | 00781-5181-92 | $0.27 | $0.41 | 23-May-14 | 54% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .075 mg tab | Mylan | 00378-1805-10 | $0.30 | $0.46 | 25-Apr-14 | 54% |
| 1,000 ct. .075 mg tab | Lannett | 00527-1343-10 | $0.30 | $0.46 | 28-Apr-14 | 54% |
| 100 ct. .075 mg tab | Lannett | 00527-1343-01 | $0.30 | $0.46 | 28-Apr-14 | 54% |
| 1,000 ct. .075 mg tab | Sandoz | 00781-5182-10 | $0.30 | $0.46 | 23-May-14 | 54% |
| 90 ct. .075 mg tab | Sandoz | 00781-5182-92 | $0.30 | $0.46 | 23-May-14 | 54% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .088 mg tab | Mylan | 00378-1807-10 | $0.30 | $0.46 | 25-Apr-14 | 54% |
| 100 ct. .088 mg tab | Lannett | 00527-1344-01 | $0.30 | $0.46 | 28-Apr-14 | 55% |
| 1,000 ct. .088 mg tab | Lannett | 00527-1344-10 | $0.30 | $0.46 | 28-Apr-14 | 54% |
| 90 ct. .088 mg tab | Sandoz | 00781-5183-92 | $0.30 | $0.46 | 23-May-14 | 55% |

58

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .1 mg tab | Mylan | 00378-1809-10 | $0.30 | $0.47 | 25-Apr-14 | 54% |
| 100 ct. .1 mg tab | Lannett | 00527-1345-01 | $0.30 | $0.47 | 28-Apr-14 | 55% |
| 1,000 ct. .1 mg tab | Lannett | 00527-1345-10 | $0.30 | $0.47 | 28-Apr-14 | 54% |
| 1,000 ct. .1 mg tab | Sandoz | 00781-5184-10 | $0.30 | $0.47 | 23-May-14 | 54% |
| 90 ct. .1 mg tab | Sandoz | 00781-5184-92 | $0.30 | $0.47 | 23-May-14 | 55% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .112 mg tab | Mylan | 00378-1811-10 | $0.35 | $0.54 | 25-Apr-14 | 54% |
| 100 ct. .112 mg tab | Lannett | 00527-1346-01 | $0.35 | $0.54 | 28-Apr-14 | 55% |
| 1,000 ct. .112 mg tab | Lannett | 00527-1346-10 | $0.35 | $0.54 | 28-Apr-14 | 54% |
| 90 ct. .112 mg tab | Sandoz | 00781-5185-92 | $0.35 | $0.54 | 23-May-14 | 55% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .125 mg tab | Mylan | 00378-1813-10 | $0.36 | $0.55 | 25-Apr-14 | 54% |
| 100 ct. .125 mg tab | Lannett | 00527-1347-01 | $0.36 | $0.55 | 28-Apr-14 | 54% |

59

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .125 mg tab | Lannett | 00527-1347-10 | $0.36 | $0.55 | 28-Apr-14 | 54% |
| 1,000 ct. .125 mg tab | Sandoz | 00781-5186-10 | $0.36 | $0.55 | 23-May-14 | 54% |
| 90 ct. .125 mg tab | Sandoz | 00781-5186-92 | $0.36 | $0.55 | 23-May-14 | 54% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct. .137 mg tab | Lannett | 00527-1638-01 | $0.36 | $0.56 | 28-Apr-14 | 54% |
| 1,000 ct. .137 mg tab | Lannett | 00527-1638-10 | $0.36 | $0.56 | 28-Apr-14 | 54% |
| 90 ct. .137 mg tab | Sandoz | 00781-5191-92 | $0.36 | $0.56 | 23-May-14 | 55% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .15 mg tab | Mylan | 00378-1815-10 | $0.37 | $0.56 | 25-Apr-14 | 54% |
| 1,000 ct. .15 mg tab | Lannett | 00527-1349-10 | $0.37 | $0.56 | 28-Apr-14 | 54% |
| 1,000 ct. .15 mg tab | Sandoz | 00781-5187-10 | $0.37 | $0.56 | 23-May-14 | 54% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct. 15 mg tab | Lannett | 00527-1349-01 | $0.37 | $0.57 | 28-Apr-14 | 54% |

60

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90 ct. .15 mg tab | Sandoz | 00781-5187-92 | $0.37 | $0.57 | 23-May-14 | 55% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .175 mg tab | Mylan | 00378-1817-10 | $0.43 | $0.67 | 25-Apr-14 | 54% |
| 100 ct. .175 mg tab | Lannett | 00527-1350-01 | $0.43 | $0.67 | 28-Apr-14 | 55% |
| 1,000 ct. .175 mg tab | Lannett | 00527-1350-10 | $0.43 | $0.67 | 28-Apr-14 | 54% |
| 90 ct. .175 mg tab | Sandoz | 00781-5188-92 | $0.43 | $0.67 | 23-May-14 | 55% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1,000 ct. .2 mg tab | Mylan | 00378-1819-10 | $0.44 | $0.67 | 25-Apr-14 | 54% |
| 100 ct. .2 mg tab | Lannett | 00527-1351-01 | $0.44 | $0.67 | 28-Apr-14 | 54% |
| 1,000 ct. .2 mg tab | Lannett | 00527-1351-10 | $0.44 | $0.67 | 28-Apr-14 | 54% |
| 90 ct. .2 mg tab | Sandoz | 00781-5189-92 | $0.44 | $0.67 | 23-May-14 | 54% |

91. There are no legitimate reasons or competitive explanations for these price hikes. There were no supply shortages or disruptions, no new patents or formulations, and no changes in drug labeling that could explain the abrupt, dramatic, and uniform price hikes.

61

92.     Federal law requires mandatory drug shortage reporting for drug manufacturers.[45] Levothyroxine is not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA.  Levothyroxine also does not appear on any archived lists of the American Society of Health-System Pharmacists ("ASHP") Current Shortage Bulletins from July 3, 2012, through today, nor does it appear on the current list of ASHP Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010).  None of the Defendants reported any drug shortages or supply disruptions to the FDA in explanation for the supracompetitive pricing of Levothyroxine.

93.     Only anticompetitive activity can explain these dramatic price increases. Pharmaceutical analyst Richard Evans at Sector & Sovereign Research explained potential causes of generic drug price hikes in a 2015 report:  "A plausible explanation is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics—low sales due to either very low prices or very low volumes—accommodate price inflation[.]"[46]

94.     Similarly, the investor platform Seekingalpha.com explained in November 2016 that its analysis revealed "evidence of collusion between the generics manufacture[r]s."[47]  Using Levothyroxine as an example, Seekingalpha.com explained:

---

[45] FDA Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 Stat. 995, 1099-1108.

[46] Ed Silverman, *Generic Drug Prices Keep Rising but is a Slowdown Coming*, WSJ (Apr. 22, 2015), *available at* https://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

[47] *We Remain Short Lannett, As Internal Collusion Investigation Does Not Assuage Our Fears*, Seekingalpha.com (Nov. 17, 2016), *available at* https://seekingalpha.com/article/4024425-remain-short-lannett-internal-collusion-investigation-assuage-fears.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Now let's look at Levothyroxine, in this case Mylan (NASDAQ:MYL) gets the ball rolling with consecutive price increases in 2013 and 2014 that are both matched within days by LCI [Lannett] and Sandoz.  Levothyroxine is not a new product (first synthesized in the 1920's) but because of the cozy pricing relationship displayed by the three generic competitors this remains a multi $100m generics market.  Again one has to question the value of competition.[48]

### D.    Defendants' Statements Suggesting Collusion

95.    Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices.

96.    These dramatic price increases were the product of an illicit understanding among Defendants.  Public statements by Defendants' CEOs and other top executives reflect their agreement to increase Levothyroxine prices.

97.    In Lannett's September 10, 2013 earnings call, its CEO, Mr. Bedrosian, was asked for his reaction to Mylan increasing the price of Levothyroxine "quite significantly." Mr. Bedrosian replied, "***You mean after I sent them the thank you note?***"  He continued:  "So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful.  Because Lannett tends to be active in raising prices. . . .  So I'm grateful to see price increases."

98.    During the same call, Mr. Bedrosian also provided his view on whether other firms would enter the generic Levothyroxine market and suggested foreknowledge about how competitors would behave.  He identified two possible competitors, and stated:  "But hopefully, both companies turn out to be responsible companies and don't go into the marketplace.  We're seeing more responsibility on the part of all of our competitors, I believe, because all of us are facing the same costs. . . . ***So I would expect that all the companies are not going to behave like***

---

[48] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

***they have in the past. And I suspect you're going to see more price increases in the generic
marketplace or certainly less price erosion in the marketplace because of that.***"[49]

99.     That same earnings call included further suggestions that Mr. Bedrosian had
advance knowledge of his competitors' pricing intentions: "I am finding a climate out there has
changed dramatically and ***I see more price increases coming from our competing competitors
than I've seen in the past.*** And we're going to continue to lead. We have more price increases
planned for this year within our budget. And hopefully, our competitors follow suit. If they
don't, that's their issue. But our plan is to raise prices on any product that we think we can or we
haven't raised a price."

100.     Mr. Bedrosian made similar statements in a subsequent earnings call on
November 7, 2013. He explained that Lannett's improved performance and guidance was
substantially the result of "price increases that we've talked about previously that have now
really hit us in a beneficial way." Martin Galvan, Lannett's CFO, publicly confirmed that
Lannett would continue to increase prices by stating that this was "the earlier days of the
increase[.]" Yet again, Mr. Bedrosian offered further assurances that price increases by his
competitors would continue: "***So these price increases that are going on in the industry, I
think they're going to stick for all the companies***."

101.     On an August 27, 2014 earnings call, Mr. Bedrosian stated that Lannett was
pricing at 75% of the brand price, and could not increase prices any further without the brand
increasing its price. When asked about the possibility of a new competitor entering the market,
Mr. Bedrosian explained: "we did know one case, a company in Europe that indicated they were
going to get an approval and they reached out to a competitor to distribute it to them ***but we***

---

[49] *Id.*

64

*know that, that competitor turned them down.  When we called them, they denied they were even working on a product.*"  Mr. Bedrosian also said that he did not think there would be any competition on Levothyroxine for the rest of the year.

102.    On November 3, 2014, Mr. Bedrosian described Mylan as "*one of those rational competitors, so we're not really expecting anything crazy from them*."  He characterized price increases as a "*rocket ship [that] is leveling off now that it's broken through the atmosphere.*"  He again described Mylan as "not [an] irrational player[], I don't see them just going out and trying to grab market share."

103.    On February 4, 2015, Mr. Bedrosian again predicted that his competitors would increase prices.  "I see people raising prices further, because the generic prices were so low, when you're 10% of the brand, that's not because the brand overpriced their product by 90%.  It's because the generic marketplace has so much competition sometimes. . . .  *We don't see that kind of behavior sustainable, and we don't see it going further into the future*.  I think you're going to find more capital pricing, more—*I'll say less competition*, in sense.  *You won't have price wars*."

104.    Mr. Bedrosian again seemed confident that Lannett need not fear competition from rivals.  In an earnings call on August 25, 2015, he explained:  "[O]verall, I feel the price increases have been sustainable and we're going into almost the third year now with some of these increases.  So we think it's a more rational market we're in."  He also credited the following rule to his Sales Vice President (who is also a target of DOJ investigation):  "you're [only as] smart as your dumbest competitor."

65

E.        **Defendants' Conspiracy**[50]

105.    During the Class Period, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices; rig bids; and engage in market allocation concerning Levothyroxine, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Levothyroxine.

105.    Beginning in September 2013, Defendants collectively caused the price of Levothyroxine to increase dramatically.  Defendants' conduct cannot be explained by normal competitive forces.  It was the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Levothyroxine in the United States.  The agreement was furthered by discussions held at meetings and industry events hosted by the GPhA, HDMA, NACDS, and ECRM, as well as other meetings and communications.

106.    To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through (1) trade-association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging, and similar means.

107.    These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid rigging, price-fixing, and market and customer allocation scheme.

---

[50] The allegations included in this section pertaining to the HDMA, NACDS, and ECRM are based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in *In re: Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

108.    The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by DOJ, and has indicated that DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.[51]    The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences and other events, as well as through direct email, phone, and text message communications."[52]

109.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Levothyroxine, rig bids, and engage in market and customer allocation concerning Levothyroxine, including, but not limited to, GPhA, the NACDS, and HDMA. In addition, Defendants regularly attended industry events hosted by the ECRM.

110.    The GPhA (now called the Association for Accessible Medicines) is the "nation's leading trade association for manufacturers and distributors of generic prescription drugs. . . ."[53] GPhA was formed in 2000 from the merger of three industry trade associations: the Generic

---

[51] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[52] Connecticut AG, Press Release (Mar. 1, 2017), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=590616&A=2341.

[53] GPhA, Membership, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

111.    GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[54]   GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

112.    Defendants Mylan and Sandoz have been regular members of the GPhA during the Class Period, and Defendant Lannett frequently attends GPhA meetings and events.  Regular members "are corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[55]

113.    Several of Defendants high-ranking corporate officers have served on GPhA's Board of Directors during and before the Class Period, including the following:

a.    **2012 Board of Directors**: Tony Mauro, President, Mylan, Inc.; Don DeGolyer, President and CEO of Sandoz;

b.    **2013 Board of Directors**: Tony Mauro, President, Mylan, Inc.; Don DeGolyer, President and CEO of Sandoz;

c.    **2014 Board of Directors**: Tony Mauro, President, Mylan, Inc.; Peter Goldschmidt, President and Head, North America at Sandoz;

---

[54] *Id.*

[55] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

d.  **2015 Board of Directors**: Marcie McClintic Coates, VP & Head of Global Regulatory Affairs for Mylan; Peter Goldschmidt, President and Head, North America at Sandoz; and

e.  **2016 Board of Directors**: Heather Bresch, CEO of Mylan; Peter Goldschmidt, President and Head, North America at Sandoz.

114.  Former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to price fixing and other anticompetitive activity concerning generic drugs, also served on GPhA's Board of Directors.

115.  The NACDS is a national trade association representing chain community pharmacies.  Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

116.  The HDMA (now called HDA) is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[56]  HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.  HDMA members during the Class Period have included all Defendants here, including Lannett, Mylan, and Sandoz.

117.  According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

---

[56] HDA, About, *available at* https://www.healthcaredistribution.org/about.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

118.    At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.

119.    ███████████████████████████████████████████

███████

120.    As further set forth below, meetings and events hosted by the GPhA, HDMA, NACDS, and ECRM were frequently held during the Class Period and attended by high-level representatives from each Defendant, including employees with price-setting authority.

121.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants, including Lannett, Mylan, and Sandoz.

122.    On February 20-22, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from at least Defendants Mylan and Sandoz, including at least the following key executives:

a.    **Mylan**: Tony Mauro, President, Mylan, Inc.; and

b.    **Sandoz**: Don DeGolyer, President.

123.    On April 20-23, 2013 NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida. NACDS's  2013 Annual Meeting was attended by representatives from Defendants, including at least the following key executives for generic drug sales and pricing:

a.    **Mylan**: Joe Duda, President, Mylan Pharmaceuticals; Robert Potter, SVP N.A. National Accounts and Channel Development; Tony Mauro, President, Mylan, Inc.; Jim Nesta, VP, Sales; and

70

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

  b.  **Sandoz**: Samuele Butera, VP & Head, Biopharmaceuticals, NA; Jeff George, Global Head; Richard Tremonte, SVP, Global Generic Pharmaceuticals; Donald DeGolyer, CEO and Board Director.

124. On June 2-5, 2013, HDMA held its 2013 Business Leadership Conference "BLC" in Orlando, Florida. HDMA's June 2013 BLC was attended by at least the following representatives from all three Defendants, who were key executives for generic drug sales and pricing:

  a.  **Lannett**: Robert Foley, Marketing Manager; Kevin Smith, VP Sales & Marketing; Tracy Sullivan, Director, National Accounts; Grace Wilks, Director Sales & Marketing;

  b.  **Mylan**: Janet Bell, National Accounts Director; Joseph Duda, Mylan Pharmaceuticals; Edgar Escoto, National Accounts Director; Kevin McElfresh, Executive Director, National Accounts; James Nesta, Executive Director, National Accounts; Robert O'Neill, VP; Sean Reilly, Key Account Manager; John Shane, Director National Trade Accounts; Gary Tighe, National Accounts Director; Lance Wyatt, National Accounts Director; and

  c.  **Sandoz**: Alan Ryan, Associate Director, National Accounts; Dawn Doggett, National Trade Affairs Account Executive.

125. On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants, including Lannett, Mylan, and Sandoz.

126. On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was

71

attended by at least the following representatives from all three Defendants, who were key executives for generic drug sales and pricing:

a.   **Lannett**: Arthur Bedrosian, President & CEO; William Schreck, COO; Justin McManus, Director, National Accounts; Kevin Smith, VP Sales & Marketing; Tracy Sullivan, National Accounts Manager; Lauren Carotenuto, National Accounts Representative; and

b.   **Mylan**: Mike Aigner, Director, National Accounts; Joe Duda, President, Mylan Pharmaceuticals; Kevin McElfresh, Executive Director, National Accounts; Robert O'Neill, Head of Sales, Generic NA; Robert Potter, SVP, National Accounts & Channel Development; Lance Wyatt, Director, National Accounts; Matt Cestra, Sr. Director Marketing; Rodney Emerson, Director, Pricing & Contracts; Edgar Escoto, Director National Accounts; Stephen Krinke, National Accounts Manager; Damon Pullman, West Regional Account Manager; Sean Reilly, National Accounts Manager;

c.   **Sandoz**: Peter Goldschmidt, President, Sandoz US & Head NA; Steven Greenstein, Director, Key Customers; Armando Kellum, VP, Sales & Marketing; Paul Krauthauser, SVP Sales & Marketing; Della Lubke, National Account Executive.

127.   On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants, including Lannett, Mylan, and Sandoz.

128.   On December 3, 2013, NACDS held its 2013 Foundation Reception Dinner that was attended by representatives from Defendants Mylan and Sandoz, including at least the following key executives for its generic drug sales and pricing:

72

a.   **Mylan**: Joe Duda, President, Mylan Pharmaceuticals; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Rob O'Neill, Head of Sales; Dave Workman, Vice President, Strategic Pricing and Contracts; and

b.   **Sandoz**: Peter Goldschmidt, President Sandoz US & Head, NA; Armando Kellum, Vice President, Sales & Marketing; and Kirko Kirkov, Executive Director, Key Customers.

129.   On February 19-21, 2014, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from at least Defendants Mylan and Sandoz, including at least the following key executives:

a.   **Mylan**: Andrea Miller, Senior Vice President, Head Global Complex Products Operations; Marcie McClintic Coates, Vice President and Head of Global Regulatory Affairs; Tony Mauro, President, Mylan Inc.; and

b.   **Sandoz**: Carlos Sattler, Vice President, Clinical Development & Medical Affairs.

130.   ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████

██  ██████████████████████████████████

████████████████████████████████

██  ██████████████████████████████████

████  ████  ████  ████  ████  ████  ████  ████

73

███████████████████████████████████

█████████████████████████

131.    On April 1, 2014, HDMA held its Sixth Annual CEO Roundtable Fundraiser in New York, HDMA's 2014 Sixth Annual CEO Roundtable Fundraiser was attended by the following representatives of Defendants, who were key executives for generic drug sales and pricing:

a.    **Mylan**: Anthony Mauro, President, Mylan, Inc.; Hal Korman, Executive Vice President and COO; James Nesta, VP, Sales; Joseph Duda, President, Mylan Pharmaceuticals; Joseph Zenkus, VP, North America Sales and Channel Strategy; Robert Potter, Senior VP, North America National Accounts and Channel Development;

b.    **Sandoz**: Anju Hasija, Executive Director, Key Accounts; Armando Kellum, Vice President, Contracts, Pricing and Business Analytics; Kirko Kirkov, Executive Director, Key Accounts; Scott Smith, Vice President, Commercial Operations; and

132.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

a.    **Mylan**: Joe Duda, President, Mylan Pharmaceuticals; Tony Mauro, President, Mylan, Inc.; Robert Potter, SVP N.A. National Accounts & Channel Development; Rob O'Neill, Head of Sales; Hal Korman, EVP & Chief Operating Officer; John Munson, Vice President, Global Accounts; and

74

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

    b.      **Sandoz**: Peter Goldschmidt, President Sandoz, US & Head, North America; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Kirko Kirkov, Executive Director, Key Customers; Scott Smith, VP Sales & Marketing;

133.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona.   The June 1-4, 2014 BLC was attended by at least the following representatives from all three Defendants, who were key executives for generic drug sales and pricing:

    a.      **Lannett**: Kevin Smith, VP Sales & Marketing; Tracy Sullivan, Director, National Accounts; Grace Wilks, Director sales & Marketing; Lauren Carotenuto, National Account Representative; Tracy Sullivan, Director, National Accounts; and

    b.      **Mylan**: Joseph Zankus, VP, N.A. Sales & Channel Strategy; Lance Wyatt, Director National Accounts; Edgar Escoto, Director National Accounts; Michael Aigner, National Accounts Manager; John Baranick, Director Trade Relations; Joseph Duda, President, Mylan Pharmaceuticals; James Nesta, President Sales; Frank Mullery, Senior Director and Controller; Richard Isaac, Senior Manager, Strategic Accounts; Michael Aigner, National Accounts Manager; John Baranick, Director, Trade Relations;  and

    c.      **Sandoz**: Lisa Badura, Director National Accounts – Sales; Anuj Hasija, Key Account Executive Director; Kirko Kirkov, Executive Director, Key Accounts; Ryan Alan, Associate Director, National Accounts; Sean Walsh, Key Account Manager.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

134.    On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants, including Lannett, Mylan, and Sandoz.

135.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by representatives from all Defendants, including at least the following key executives for generic drug sales and pricing:

a.    **Lannett**: Kevin Smith, VP Sales & Marketing; Tracy Sullivan, Director, National Accounts; Justin McManus, Director National Accounts & Sales;

b.    **Mylan**: Joe Duda, President, Mylan Pharmaceuticals; Robert Potter, SVP N.A. National Accounts; Mike Aigner, Director, National Accounts; Tony Mauro, President; Kevin McElfresh, Executive Director, National Accounts; Gary Tighe, Director, National Accounts; Lance Wyatt, Director, National Accounts; Edgar Escoto, Director, National Accounts; Stephen Krinke, National Account Manager; Sean Reilly, National Account Manager; Michael Scouvart, Head of Marketing, N.A.; John Baranick, Director, Trade Relations; Jim Nesta, VP, Sales; and

c.    **Sandoz**: Lisa Badura, Director, Key Customers; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Della Lubke, National Account Executive; Scott Smith, VP Sales & Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers.

76

136.    On December 3, 2014, NACDS held its 2014 Foundation Reception Dinner that was attended by representatives from Defendants Mylan and Sandoz, including at least the following key executives for generic drug sales and pricing;

      a.    **Mylan**: Tony Mauro, Mylan, Inc.; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Edgar Escoto, Director, National Accounts; and

      b.    **Sandoz**: Scott Smith, Vice President, Sales and Marketing; and Armando Kellum, Vice President, Sales & Marketing.

137.    On June 9-10, 2015, GPhA held a meeting in Bethesda, Maryland that was attended by all three Defendants.

138.    In 2014, 2015, and 2016, Defendants continued to regularly attend trade-association meetings, conferences and events, including: (i) the October 27-29, 2014 GPhA meeting in Bethesda, Maryland; (ii) the February 9-11 GPhA Annual Meeting in Miami, Florida; (iii) ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (iv) the April 14, 2015 HDMA Seventh Annual CEO Roundtable Fundraiser in New York, New York; (v) the April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida; (vi) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (vii) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (viii) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (ix) the November 2-4, 2015 GPhA meeting in Bethesda, Maryland; (x) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (xi) the April 16-19, 2016, NACDS 2016 Annual Meeting in Palm Beach, Florida; (xii) the June 12-16, 2016 HDMA BLC in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Colorado Springs, Colorado; and (xiii) the August 6-9, 2016 NACDS 2016 Total Store Expo in Boston, Massachusetts.

139.    As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.  Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their contracts with customers.[57]

140.    In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[58]

141.    A large number of generic drug manufacturers, including all Defendants here, are headquartered in close proximity to one another in New Jersey and Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

---

[57] State AG Complaint ¶¶ 50-52.
[58] *Id.* ¶¶ 53-60.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

142.     Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.   During these GNOs, meetings, and dinners, these employees meet with their competitors and discuss competitively sensitive information.   Several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

143.     Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

144.     Defendants also routinely communicate and share information with each other about bids and pricing strategy.   This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

145.     Additionally, Defendants share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

**F.     Defendants' Concerted Efforts to Increase Prices for Generic Levothyroxine Yielded Supracompetitive Profits**

146.     As demonstrated in the charts above, Defendants' agreement led to skyrocketing prices for Levothyroxine.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

147.    These price increases were not the product of unilateral business decisions, but resulted instead from agreements to fix prices.  The enormous price hikes were not accompanied by a significant change in costs to manufacturers.  Thus, the increased prices resulted in an enormous increase in profits to Defendants.

148.    For example, Sandoz reported rising revenues in its United States generics business during the Class Period.  In an earnings call on July 21, 2015, Novartis CEO Joe Jiminez stated:  "Sandoz delivered very strong financial results with sales and profit up double-digit[;] as you can see this is driven by the division[']s increased focus on core markets particularly the U.S., which is up 23%."

149.    Similarly, on October 30, 2015, John Sheehan, Mylan's CFO, stated in an earnings call:

> With respect to gross margin, I guess I would start by pointing out that since 2010 our gross margins have increased from 45% up to the high end of the guidance range that we indicated we would be at this year of 55%.  So the gross margins have been sustained. They have steadily increased over the last five, six years. . . .  It also has been driven by the positive pricing environment that we've seen, especially over the last couple of years in North America.

150.    On February 6, 2014, Mr. Bedrosian reported in an earnings call on Lannett's record-setting financial performance:

> For the fiscal 2014 second quarter, we recorded the highest net sales, gross margin and net income in our company's history.  Net sales increased 84% to $67 million.  Gross margin more than tripled.  And net income grew to $17 million, which was nearly 6x the net income we recorded in last year's second quarter.  We are pleased to have reported 5 consecutive quarters of record sales.

151.    Mr. Bedrosian stated on the same call that "price increases on key products" were a "primary driver[]" of Lannett's "excellent second quarter performance."  And Lannett's CFO

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Mr. Galvan identified generic Levothyroxine as one of two "key products that are driving it from a driving our gross margin from a price increase perspective[.]"   "Net sales for our largest product category, thyroid deficiency," Mr. Galvan reported, "grew to $26.2 million or 39% of our total net sales."

152.    The profits have continued to roll in from the surpracompetitive Levothyroxine prices.   On February 3, 2016 earnings call, Mr. Galvan confirmed that Levothyroxine was Lannett's "largest product" with gross margins "above 50%."

**G.    Factors Increasing the Market's Susceptibility to Collusion**

153.    Publicly available data on the generic Levothyroxine market in the United States demonstrate that it is susceptible to cartelization by Defendants.   Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

**1.    Industry Concentration**

154.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.   Here, Defendants control the entire generic Levothyroxine market with approximately a ███ market share.

155.    While the market for Levothyroxine is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition.   Absent collusion, prices would have remained at competitive levels.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

156.    No departures from the market by manufacturers of Levothyroxine can explain the price increases.

157.    Defendants have been able to maintain supracompetitive prices for Levothyroxine without significant loss of market share to non-conspirators.  Thus, Defendants have oligopolistic market power in the market for Levothyroxine.

158.    The magnitude of Defendants' price increases for Levothyroxine distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase.  But here the increases are extreme–increasing by as much as ██████ in some instances.  Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 2.    Barriers to Entry

159.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available.  However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

160.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic Levothyroxine markets that make such entry time-consuming and expensive.

161.    Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Levothyroxine markets.

162.    In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time.  As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[59]   This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3. Demand Inelasticity

163.   Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product.   It is a measure of how demand for a product reacts to a change in price.   The basic necessities of life— food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life.   In other words, a person on the verge of dying of thirst will pay almost anything for water.

164.   In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.   Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether.   Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

165.   Demand for generic Levothyroxine is highly inelastic.   Levothyroxine is a critical drug necessary for the functioning of a basic health system.   It is essentially the exclusive treatment for hypothyroidism, and most patients require lifelong consumption of it.   When

---

[59] Sen. Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

doctors prescribe generic Levothyroxine, patients therefore view it as necessary to their well-being.  This gives Defendants significant pricing power, as well as an incentive to collude.

166.    Thus, generic Levothyroxine is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 4.    Lack of Substitutes

167.    The next-best substitute for generic Levothyroxine is branded Levothyroxine, which costs significantly more than generic alternatives.   In addition, branded versions of Levothyroxine do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over even their supra-competitively priced generic counterparts, making them inapt substitutes even when generic prices soar.

168.    Thus, purchasers of generic Levothyroxine are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.    Standardized Product with High Degree of Interchangeability

169.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

170.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price.  When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

171.    Defendants' generic Levothyroxine products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.

172.    Moreover, because generic Levothyroxine products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service.  Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds.  The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[60]  The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.    Inter-competitor Contacts and Communications

173.    As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events.  Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings.  As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[61]

---

[60] *See, e.g.*, GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[61] PaRR Report.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

174.   The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events.   For example, Heritage's Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

175.   DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.   These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[62]   The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

(a)   **Actavis**: In February 2016, Actavis's former parent, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[63]

---

[62] State AG Complaint ¶ 7.

[63] Allergan, SEC 2015 Form 10-K at F-106 (Feb. 26, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)   **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[64]  The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[65]

(c)   **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products."  The Connecticut AG requested that Citron produce all documents produced to DOJ.[66]

(d)   **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[67]

(e)   **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives,

---

[64] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit*, Reuters (Dec. 15, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[65] Aurobindo, BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

[66] Aceto, SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[67] Dr. Reddy's, SEC Form 6-K at 57 (Dec. 31, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Heritage confirmed that it is "fully cooperating" with DOJ,[68] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.

(f)      **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[69]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[70]  In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications.  In particular . . . digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[71]

(g)      **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[72]  On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry

---

[68] Tom Schoenberg, David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas*, Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[69] Impax, SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[70] Impax, SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

[71] Impax, SEC 2015 Form 10-K at 53 (Feb. 22, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[72] Lannett, Press Release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

into possible violations of the Sherman Act."   The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[73]   On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[74]

(h)     **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena . . . seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[75]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products.  The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[76]

---

[73] Lannett, SEC Form 10-Q at 16 (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[74] Lannett, SEC Form 10-K at 18 (Aug. 27, 2015), available at http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[75] Mayne, 2016 Annual Report at 75 (Aug. 25, 2016), *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf

[76] Mayne, *Update on DOJ Investigation* (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(i)   **Mylan**: In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to . . . generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to . . . certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[77] On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Levothyroxine and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[78]

(j)   **Par**: In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[79]   In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania.   The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products.   Par is

---

[77] Mylan, SEC 2015 Form 10-K at 160 (Feb. 16, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[78] Mylan, SEC Form 10-Q at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

[79] Par, SEC 2014 Form 10-K at 37 (Mar. 12, 2015), *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

90

currently cooperating fully with the investigation."[80]  Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[81]

(k)     **Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[82]

(l)     **Pfizer:**  On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[83]

(m)     **Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US

---

[80] Endo, SEC Form 10-Q at 30 (March 31, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm

[81] *Id.* at 31.

[82] Press Release, Perrigo, Perrigo Discloses Investigation (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[83] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products . . . and related communications with competitors."[84]

(n)   **Sun**: On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Taro) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents . . . relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[85]

(o)   **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[86]

(p)   **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[87]

---

[84] Novartis, 2016 Financial Report at 217 (Jan. 24, 2017), *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf.

[85] Sun, BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[86] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[87] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(q)   **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[88]

## X.   THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.   The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy

176.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' and other generic drug manufacturers' disclosures of the existence of the government investigations and subpoenas.  Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Levothyroxine.

177.   No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Levothyroxine.

178.   Plaintiffs are purchasers who indirectly purchased generic Levothyroxine manufactured by one or more Defendants.  They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

179.   Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

---

[88] *See* Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a)     Lannett's Code of Business Conduct and Ethics "promotes compliance with laws."[89]

(b)     Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[90]

(c)     Novartis's (the parent of Sandoz) Code of Conduct provides:  "We are committed to fair competition and will not breach competition laws and regulations."[91]

180.    It was reasonable for members of the Classes to believe that Defendants were complying with their own antitrust policies.

181.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.     Fraudulent Concealment Tolled the Statutes of Limitations**

182.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas.  Prior to that time, no information in the public domain or

---

[89] Lannett Code of Business Conduct and Ethics, *available at* http://www.lannett.com/docs/2013_Code_of_Business_Conduct_and_Ethics.pdf (last visited Aug. 9, 2017).

[90] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf (last visited Aug. 9, 2017).

[91] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf (last visited Aug. 9, 2017).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Levothyroxine.

183.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Levothyroxine.

184.    As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Levothyroxine.   The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Levothyroxine they purchased.   Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Levothyroxine.   Defendants' false statements and conduct concerning the prices of generic Levothyroxine were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Levothyroxine at prices established by a free and fair market.

### 1.    Active Concealment of the Conspiracy

185.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.   Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

186.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes.   Defendants' misrepresentations regarding their price changes were intended to lull

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Levothyroxine.

187.    As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[92]

188.    The Defendants also gave pretextual reasons for price increases. The Defendants regularly spoke in earnings calls and other forums about competition among generic drug manufacturers. For example:

(a)    Lannett stated in documents filed with the SEC in 2016: "We face strong competition in our generic product business."[93]

(b)    Mylan's parent company, Mylan N.V., stated in documents filed with the SEC in 2015 that "[t]he pharmaceutical industry is highly competitive" and that it "face[s] vigorous competition from other pharmaceutical manufacturers that threatens the commercial acceptance and pricing of our products."[94]

---

[92] State AG Complaint ¶ 13.

[93] Lannett, SEC Form 10-K at 22 (June 30, 2016), *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465916141905/a16-13983_110k.htm.

[94] Mylan, SEC Form 10-Q at 76 (May 8, 2015), *available at* http://investor.mylan.com/secfiling.cfm?filingID=1623613-15-9&CIK=1623613.

96

(c)     Sandoz's parent company, Novartis AG, told the SEC in 2014: "Competition within the industry is intense and extends across a wide range of commercial activities, including pricing, product characteristics, customer service, sales and marketing, and research and development."[95]

189.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Levothyroxine to inflated, supracompetitive levels.

## 2.     Plaintiffs Exercised Reasonable Diligence

190.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

191.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

192.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes

---

[95] Novartis, SEC Form 20-F at 54 (Jan. 29, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1114448/000104746914000415/a2217883z20-f.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

193.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## XI.    <u>CONTINUING VIOLATIONS</u>

194.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.   Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XII.    <u>DEFENDANTS' ANTITRUST VIOLATIONS</u>

195.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Levothyroxine sold in the United States.

196.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of generic Levothyroxine sold in the United States.   These activities included the following:

(a)    Defendants participated in meetings and/or conversations regarding the price of generic Levothyroxine in the United States;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Levothyroxine sold in the United States;

(c)     Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Levothyroxine; and

(d)     Defendants issued price announcements and price quotations in accordance with their agreements.

197.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

198.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Levothyroxine at inflated and supracompetitive prices.

199.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

200.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Levothyroxine than they would have paid in a competitive market.

201.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below.  Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs.  Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Classes.  The impairment

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Levothyroxine.

202.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)    price competition in the market for generic Levothyroxine has been artificially restrained;

(b)    prices for generic Levothyroxine sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)    end-payer purchasers of generic Levothyroxine sold by Defendants have been deprived of the benefit of free and open competition in the market for generic Levothyroxine.

## XIII.   CLASS ACTION ALLEGATIONS

203.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Levothyroxine products (generic levothyroxine sodium 0.025, 0.05, 0.088, 0.1, 0.112, 0.125, 0.137, 0.15, 0.175, 0.2, or 0.3mg tablets), other than for resale, from September 2013 through the present.
>
> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Levothyroxine products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

purchases of Defendants' generic Levothyroxine products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

204.     Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[96] on behalf of the following class (the "Damages Class"):

> All persons and entities in the End-Payer Damages Jurisdictions who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Levothyroxine products (generic levothyroxine sodium 0.025, 0.05, 0.088, 0.1, 0.112, 0.125, 0.137, 0.15, 0.175, 0.2, or 0.3 mg tablets), other than for resale, from September 2013 through the present.
>
> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Levothyroxine products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Levothyroxine products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

205.     The Nationwide Class and the Damages Class are referred to herein as the "Classes."

---

[96] The "End-Payer Damages Jurisdictions" consist of: all States (except Indiana and Ohio), as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

206.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

207.    Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members the Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Levothyroxine and/or engaged in market allocation for generic Levothyroxine sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of generic Levothyroxine sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Levothyroxine, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

208.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Levothyroxine purchased indirectly from Defendants and/or their co-conspirators.  Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

209.    Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

210.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

211.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

212.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XIV.   CAUSES OF ACTION

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

213.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

214.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

104

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

215.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Levothyroxine, thereby creating anticompetitive effects.

216.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Levothyroxine.

217.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End-Payers in the Nationwide Class who purchased generic Levothyroxine have been harmed by being forced to pay inflated, supracompetitive prices for generic Levothyroxine.

218.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

219.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for generic Levothyroxine has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for generic Levothyroxine provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased generic Levothyroxine indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

220.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Levothyroxine purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

221.     Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

222.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## **SECOND COUNT**

### **Violation of State Antitrust Statutes[97]**
### **(on behalf of Plaintiffs and the Damages Class)**

223.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

224.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Levothyroxine in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

225.     The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Levothyroxine and to allocate customers for generic Levothyroxine in the United States.

---

[97] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

226.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Levothyroxine at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Levothyroxine provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

227.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Levothyroxine.

228.     Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

229.     [INTENTIONALLY LEFT BLANK]

**Arizona**

230.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq.* Defendants' combination and conspiracy had the following effects: (1) price competition for generic Levothyroxine was restrained, suppressed, and eliminated throughout Arizona; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

107

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq.*

**California**

231.     Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Levothyroxine at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Levothyroxine. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Levothyroxine. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Levothyroxine has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Levothyroxine provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Levothyroxine indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Levothyroxine than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

**Connecticut**

231(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-35, *et seq.* Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Levothyroxine was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By

109

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-35, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Connecticut law.

**District of Columbia**

232.     Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq.* Defendants' combination and conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Levothyroxine in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Levothyroxine in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Levothyroxine, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq.* Accordingly, Plaintiffs and

110

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq.*

**Hawaii**

233.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq.*

**Illinois**

234.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels

111

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

**Iowa**

235.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Kansas**

236.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq.* Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Levothyroxine, increasing the prices of generic Levothyroxine, preventing competition in the sale of generic Levothyroxine, or binding themselves not to sell generic Levothyroxine, in a manner that established the price of generic Levothyroxine and precluded free and unrestricted competition among themselves in the sale of generic Levothyroxine, in violation of Kan. Stat. Ann. § 50-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

**Maine**

237.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq.*) Defendants'

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

combination or conspiracy had the following effects: (1) generic Levothyroxine price

competition was restrained, suppressed, and eliminated throughout Maine; (2) generic

Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels

throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and

open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive,

artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal

conduct substantially affected Maine commerce. As a direct and proximate result of Defendants'

unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their

business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat.

Ann. 10, § 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all

relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq.*

**Maryland**

237(a). Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, *et seq*.

Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine

price competition was restrained, suppressed, and eliminated throughout Maryland; (2) generic

Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels

throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free

and open competition; and (4) Plaintiffs and members of the Damages Class paid

supracompetitive, artificially inflated prices for generic Levothyroxine.  During the Class Period,

Defendants' illegal conduct substantially affected Maryland commerce.  As a direct and

proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maryland law.

**Michigan**

238.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq.*

**Minnesota**

239.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

restrained, suppressed, and eliminated throughout Minnesota; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq.*

**Mississippi**

240.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq.* Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

116

Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

**Nebraska**

241.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nevada**

242.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of Nevada Revised Statutes Annotated § 598A.010, *et seq.* Defendants' combination or

conspiracy had the following effects: (1) generic Levothyroxine price competition was

restrained, suppressed, and eliminated throughout Nevada; (2) generic Levothyroxine prices

were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3)

Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct

substantially affected Nevada commerce. As a direct and proximate result of Defendants'

unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their

business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat.

Ann. § 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all

relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq.*

**New Hampshire**

243.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of New Hampshire Revised Statutes § 356:1, *et seq.* Defendants' combination or

conspiracy had the following effects: (1) generic Levothyroxine price competition was

restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Levothyroxine

prices were raised, fixed, maintained and stabilized at artificially high levels throughout New

Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive,

118

artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal

conduct substantially affected New Hampshire commerce. As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured

in their business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of New Hampshire

Revised Statutes § 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek

all relief available under New Hampshire Revised Statutes § 356:1, *et seq.*

**New Mexico**

244.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of New Mexico Statutes Annotated § 57-1-1, *et seq.* Defendants' combination or

conspiracy had the following effects: (1) generic Levothyroxine price competition was

restrained, suppressed, and eliminated throughout New Mexico; (2) generic Levothyroxine prices

were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico;

(3) Plaintiffs and members of the Damages Class were deprived of free and open competition;

and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct

substantially affected New Mexico commerce. As a direct and proximate result of Defendants'

unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their

business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat.

Ann. § 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief

available under New Mexico Stat. Ann. § 57-1-1, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New York**

245.     Defendants have entered into an unlawful agreement in restraint of trade in

violation of New York's Donnelly Act, New York General Business Law § 340, *et seq.*

Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine

price competition was restrained, suppressed, and eliminated throughout New York; (2) generic

Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels

throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free

and open competition; and (4) Plaintiffs and members of the Damages Class paid

supracompetitive, artificially inflated prices for generic Levothyroxine that were higher than they

would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal

conduct substantially affected New York commerce. As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured

in their business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of the New York's

Donnelly Act, New York General Business Law § 340, *et seq.* The conduct set forth above is a

per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all

relief available under New York Gen. Bus. Law § 340, *et seq.*

**North Carolina**

246.     Defendants have entered into an unlawful agreement in restraint of trade in

violation of the North Carolina General Statutes § 75-1, *et seq.* Defendants' combination or

conspiracy had the following effects: (1) generic Levothyroxine price competition was

restrained, suppressed, and eliminated throughout North Carolina; (2) generic Levothyroxine

prices were raised, fixed, maintained and stabilized at artificially high levels throughout North

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

**North Dakota**

247.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Cent. Code § 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek

all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq.*

**Oregon**

248.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of Oregon Revised Statutes § 646.705, *et seq.* Defendants' combination or conspiracy

had the following effects: (1) generic Levothyroxine price competition was restrained,

suppressed, and eliminated throughout Oregon; (2) generic Levothyroxine prices were raised,

fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

Levothyroxine. During the Class Period, Defendants' illegal conduct had a substantial effect on

Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

and members of the Damages Class have been injured in their business and property and are

threatened with further injury. By reason of the foregoing, Defendants have entered into an

agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.*

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon

Revised Statutes § 646.705, *et seq.*

**Rhode Island**

249.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq.*

Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine

price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2)

generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived

of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period,

Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and

proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class

have been injured in their business and property on or after July 15, 2013, and are threatened

with further injury. By reason of the foregoing, Defendants have entered into an agreement in

restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq.* Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Rhode Island

General Laws § 6-36-1, *et seq.*

### South Dakota

250.   Defendants have entered into an unlawful agreement in restraint of trade in

violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combination or

conspiracy had the following effects: (1) generic Levothyroxine price competition was

restrained, suppressed, and eliminated throughout South Dakota; (2) generic Levothyroxine

prices were raised, fixed, maintained and stabilized at artificially high levels throughout South

Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive,

artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal

conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured

in their business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of South Dakota

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Codified Laws Ann. § 37-1-3.1, *et seq.* Accordingly, Plaintiffs and members of the Damages

Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.*

**Tennessee**

251.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of Tennessee Code Annotated § 47-25-101, *et seq.* Defendants' combination or

conspiracy had the following effects: (1) generic Levothyroxine price competition was

restrained, suppressed, and eliminated throughout Tennessee; (2) generic Levothyroxine prices

were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3)

Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct had a

substantial effect on Tennessee commerce. As a direct and proximate result of Defendants'

unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their

business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code

Ann. § 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all

relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

**Utah**

252.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of Utah Code Annotated § 76-10-3101, *et seq.* Defendants' combination or conspiracy

had the following effects: (1) generic Levothyroxine price competition was restrained,

suppressed, and eliminated throughout Utah; (2) generic Levothyroxine prices were raised, fixed,

maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

**Vermont**

253.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Accordingly,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq.*

**West Virginia**

254.     Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq.*

**Wisconsin**

255.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq.* Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs

126

and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Levothyroxine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq.*

**As to All Jurisdictions Above**

256.    Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Levothyroxine than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

257.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

258.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Violation of State Consumer Protection Statutes[98]
### (on behalf of Plaintiffs and the Damages Class)

259.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

260.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**Alaska**

261.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq.*  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive"

---

[98] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, Wisconsin and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Arkansas**

262.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.* Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Levothyroxine prices were raised, fixed,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected

Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of

Defendants, Plaintiffs and members of the Damages Class have been injured in their business

and property and are threatened with further injury. Defendants have engaged in unfair

competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, §

4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief

available under that statute.

**California**

263.     Defendants have engaged in unfair competition or unfair, unconscionable,

deceptive or fraudulent acts or practices in violation of California Business and Professions Code

§ 17200, *et seq.* During the Class Period, Defendants manufactured, marketed, sold, or

distributed generic Levothyroxine in California, and committed and continue to commit acts of

unfair competition, as defined by § 17200, *et seq.* of the California Business and Professions

Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to

§§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from

these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and

Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as

alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-

disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing

course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business

130

acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Levothyroxine in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Levothyroxine. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

### Colorado

264.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.*  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Delaware**

265.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

generic Levothyroxine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### District of Columbia

266.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic Levothyroxine were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Levothyroxine because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Levothyroxine, including their illegal conspiracy to secretly fix the price of generic Levothyroxine at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic Levothyroxine. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

267.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

135

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Georgia**

268.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.* and the Georgia Fair Businesses Practices Act, Georgia Code Ann. § 10-1-390, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

136

Levothyroxine. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia law, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Hawaii**

269.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

injured and are threatened with further injury. Defendants have engaged in unfair competition or

unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq.*, and,

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

statute.

**Massachusetts**

270.    Defendants have engaged in unfair competition or unlawful, unfair,

unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch

93A, § 1, *et seq.* Defendants were engaged in trade or commerce as defined by G.L. 93A.

Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of

trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and

artificially inflated levels, the prices at which generic Levothyroxine were sold, distributed, or

obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and

members of the Damages Class. The aforementioned conduct on the part of Defendants

constituted "unfair methods of competition and unfair or deceptive acts or practices in the

conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11.

Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price

competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic

Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels

throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of

free and open competition; and (4) Plaintiffs and the members of the Damages Class paid

supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period,

Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a

direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class have been injured in their business and property and are threatened with further

injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11, that were knowing or willful, and,

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that

statute, including multiple damages.

**Michigan**

271.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich.

Compiled Laws § 445.903, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade

or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and

non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or

obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and

members of the Damages Class concerning Defendants' unlawful activities and artificially

inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the

Class Period that Defendants' generic Levothyroxine prices were competitive and fair.

Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price

competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic

Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels

throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free

and open competition; and (4) Plaintiffs and members of the Damages Class paid

supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period,

Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a

direct and proximate result of Defendants' violations of law, Plaintiffs and members of the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Minnesota**

272.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants'

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are

threatened with further injury. Defendants have engaged in unfair competition or unfair or

deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq.*, and, accordingly,

Plaintiffs and members of the Class seek all relief available under that statute and as equity

demands.

**Missouri**

273.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev.

Stat. § 407.010, *et seq.* Plaintiffs and members of the Damages Class purchased generic

Levothyroxine for personal or family purposes. Defendants engaged in the conduct described

herein in connection with the sale of generic Levothyroxine in trade or commerce in a market

that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain,

at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold,

distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was

unlawful under federal and state law, violated public policy, was unethical, oppressive and

unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and

members of the Damages Class concerning Defendants' unlawful activities and artificially

inflated prices for generic Levothyroxine. The concealed, suppressed, and omitted facts would

have been important to Plaintiffs and members of the Damages Class as they related to the cost

of generic Levothyroxine they purchased. Defendants misrepresented the real cause of price

increases and/or the absence of price reductions in generic Levothyroxine by making public

statements that were not in accord with the facts. Defendants' statements and conduct concerning

141

the price of generic Levothyroxine were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing generic Levothyroxine at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025.

**Montana**

274.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants marketed, sold, or distributed generic Levothyroxine in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, et. seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nebraska**

275.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the

143

Class Period, Defendants marketed, sold, or distributed generic Levothyroxine in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nevada**

276.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct had a substantial effect on

144

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Hampshire**

277.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants marketed, sold, or distributed generic Levothyroxine in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct,

145

Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Jersey**

278.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of

146

unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Mexico**

279.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Levothyroxine were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Levothyroxine as set forth in New Mexico Stat. § 57-12-2E.  Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any

147

meaningful choice in purchasing generic Levothyroxine because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Levothyroxine, including their illegal conspiracy to secretly fix the price of generic Levothyroxine at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Levothyroxine. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

148

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New York**

280.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Levothyroxine that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Levothyroxine; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Levothyroxine were misled to believe that they were paying a fair price for generic Levothyroxine or the price increases for generic Levothyroxine were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Levothyroxine would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Levothyroxine would have a broad impact, causing consumer class members who indirectly purchased generic Levothyroxine to be injured by paying more for generic Levothyroxine than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants marketed, sold, or distributed generic Levothyroxine in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Levothyroxine in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**North Carolina**

281.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of

150

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Levothyroxine created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants marketed, sold, or distributed generic Levothyroxine in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Levothyroxine in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**North Dakota**

282.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property

152

as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Rhode Island**

283.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.* Members of the Damages Class purchased generic Levothyroxine for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

suppressed, and eliminated throughout Rhode Island; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Levothyroxine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**South Carolina**

284.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

South Carolina; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**South Dakota**

285.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Levothyroxine prices were

155

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Levothyroxine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Utah**

286.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq.* Members of the Damages Class purchased generic Levothyroxine for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic

157

Levothyroxine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

287.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of

158

law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Virginia**

288.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq.*  Members of the Damages Class purchased generic Levothyroxine to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated

159

throughout Virginia; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Levothyroxine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**West Virginia**

289.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose

material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful

activities and artificially inflated prices for generic Levothyroxine. Defendants affirmatively

misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine

prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1)

generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout

West Virginia; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages

Class were deprived of free and open competition; and (4) Plaintiffs and members of the

Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine.

Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a

direct and proximate result of Defendants' violations of law, Plaintiffs and members of the

Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use

or employment of unconscionable and deceptive commercial practices as set forth above. That

loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants'

deception, including their affirmative misrepresentations and omissions concerning the price of

generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to

believe that they were purchasing generic Levothyroxine at prices set by a free and fair market.

Defendants' affirmative misrepresentations and omissions constitute information important to

Plaintiffs and members of the Damages Class as they related to the cost of generic

Levothyroxine they purchased. Defendants have engaged in unfair competition or unfair or

deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq.*, and, accordingly,

Plaintiffs and members of the Damages Class seek all relief available under that statute.

161

**Wisconsin**

290.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages

162

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Class as they related to the cost of generic Levothyroxine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**U.S. Virgin Islands**

291.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Levothyroxine were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Levothyroxine. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Levothyroxine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Levothyroxine price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Levothyroxine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Levothyroxine. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of

163

Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Levothyroxine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Levothyroxine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Levothyroxine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## FOURTH COUNT

### Unjust Enrichment[99]
### (on behalf of Plaintiffs and the Damages Class)

292.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

293.     To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

294.     Defendants have unlawfully benefited from their sales of Levothyroxine because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine at prices that were more than they would have been but for Defendants' unlawful actions.

---

[99] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

295.     Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

296.     Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

297.     Defendants have been enriched by revenue resulting from unlawful overcharges for Levothyroxine while Plaintiffs and the Damages Class have been impoverished by the overcharges they paid for Levothyroxine imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

298.     There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

299.     Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

300.     The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Levothyroxine.

301.     The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Levothyroxine are ascertainable by review of sales records.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

302.     It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Levothyroxine.

303.     It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Levothyroxine, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

304.     The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Levothyroxine is a direct and proximate result of Defendants' unlawful practices.

305.     The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

306.     It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, Puerto Rico and the U.S. Virgin Islands, for Defendants to be permitted to retain any of the overcharges for Levothyroxine derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

307.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

166

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

308.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Levothyroxine.

309.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Levothyroxine by Plaintiffs and the Damages Class.

310.     Plaintiffs and the Damages Class have no adequate remedy at law.

311.     By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of Levothyroxine and forcing them to pay higher prices for Levothyroxine, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

312.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Alabama at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Levothyroxine.  It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

**Alaska**

313.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Alaska at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Arizona**

314.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Levothyroxine. Plaintiffs and the Damages Class have been impoverished by the overcharges for Levothyroxine resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

**Arkansas**

315.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Arkansas at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### California

316.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in California at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

### Colorado

317.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Colorado at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants have benefitted at the expense of Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Connecticut

318.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Connecticut at prices that were more than they would have

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

been but for Defendants' actions.  Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Delaware**

319.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Delaware at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Levothyroxine.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Levothyroxine resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

**District of Columbia**

320.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in the District of Columbia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

321.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Florida at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Georgia**

322.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Georgia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Hawaii**

323.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Hawaii at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

171

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Idaho**

324.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Illinois**

325.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Illinois at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Iowa**

326.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Iowa at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Levothyroxine, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kansas**

327.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Kansas at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kentucky**

328.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Kentucky at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit

conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the

Damages Class.

### Louisiana

329.     Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Levothyroxine in Louisiana at prices that were more than they would have

been but for Defendants' actions.  Defendants have been enriched by revenue resulting from

unlawful overcharges for Levothyroxine.  Plaintiffs and the Damages Class have been

impoverished by the overcharges for Levothyroxine resulting from Defendants' unlawful

conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are

connected.  There is no justification for Defendants' receipt of the benefits causing their

enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to

Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained

from their unlawful overcharges.  Plaintiffs and the Damages Class have no other remedy at law.

### Maine

330.     Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Levothyroxine in Maine at prices that were more than they would have been

but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or

appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Maryland**

331.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Maryland at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Massachusetts**

332.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Massachusetts at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Michigan**

333.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Michigan at prices that were more than they would have

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Minnesota

334.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Minnesota at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Mississippi

335.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Mississippi at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retain the benefit of overcharges received on the sales of Levothyroxine, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct.  Under the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Missouri**

336.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Missouri at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

**Montana**

337.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Montana at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Nebraska**

338.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Nebraska at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages

177

Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

**Nevada**

339.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Nevada at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Levothyroxine.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Hampshire**

340.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in New Hampshire at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

341.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in New Jersey at prices that were more than they would have

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

been but for Defendants' actions. Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to Defendants' sales of Levothyroxine. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Mexico**

342.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in New Mexico at prices that were more than they would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Levothyroxine. To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

343.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in New York at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Levothyroxine, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit. Defendants'

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

enrichment has occurred at the expense of Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

344.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in North Carolina at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.  Defendants consciously accepted the benefits conferred upon them.

**North Dakota**

345.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Levothyroxine.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Levothyroxine resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

### Oklahoma

346.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Oklahoma at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Plaintiffs and the Damages Class have no remedy at law.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

### Oregon

347.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Oregon at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Pennsylvania**

348.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Puerto Rico**

349.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Puerto Rico at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Levothyroxine.  Plaintiffs and the Damages Class have been impoverished by the overcharges for Levothyroxine resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.  There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Rhode Island**

350.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Rhode Island at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Carolina**

351.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in South Carolina at prices that were more than they would have been but for Defendants' actions.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Dakota**

352.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in South Dakota at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

revenue resulted from anticompetitive prices that inured to the benefit of Defendants.

Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.

Under the circumstances, it would be inequitable and unjust for Defendants to retain such

benefits without reimbursing Plaintiffs and the Damages Class.

**Tennessee**

353.    Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Levothyroxine in Tennessee at prices that were more than they would have

been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic

benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit

bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the

Damages Class.  It would be futile for Plaintiffs and the Damages Class to seek a remedy from

any party with whom they have privity of contract. Defendants have paid no consideration to any

other person for any of the unlawful benefits they received indirectly from Plaintiffs and the

Damages Class with respect to Defendants' sales of Levothyroxine.  It would be futile for

Plaintiffs and the Damages Class to exhaust all remedies against the entities with which Plaintiffs

and the Damages Class have privity of contract because Plaintiffs and the Damages Class did not

purchase Levothyroxine directly from any Defendant.

**Texas**

354.    Defendants unlawfully overcharged End-payers, who made purchases of or

reimbursements for Levothyroxine in Texas at prices that were more than they would have been

but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for Levothyroxine.  Plaintiffs and the Damages Class have no remedy at law.

**Utah**

355.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Utah at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Vermont**

356.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Vermont at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Virginia**

357.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them.  Defendants should reasonably have expected to repay Plaintiffs and the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Levothyroxine.  Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Damages Class.

**Washington**

358.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Washington at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**West Virginia**

359.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in West Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wisconsin**

360.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wyoming**

361.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in Wyoming at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

187

economic detriment of Plaintiffs and the Damages Class.  Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**U.S. Virgin Islands**

362.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Levothyroxine in the United States Virgin Islands at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Levothyroxine, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

363.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

364.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

365.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

366.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

367.    Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

368.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

369.    Plaintiffs and members of the Classes be awarded pre- and post- judgment interest

as provided by law, and that such interest be awarded at the highest legal rate;

370.    Plaintiffs and members of the Classes recover their costs of suit, including

reasonable attorneys' fees, as provided by law; and

371.    Plaintiffs and members of the Classes have such other and further relief as the

case may require and the Court may deem just and proper.

## XVI.  JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

  April 1, 2019                                    Respectfully submitted,


 

Roberta D. Liebenberg, Esquire
Fine, Kaplan and Black, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
(215) 567-6565
rliebenberg@finekaplan.com

**Lead Counsel for the End-Payer Plaintiffs**

| | |
|---|---|
| Gregory S. Asciolla, Esquire | Michael M. Buchman, Esquire |
| Labaton Sucharow LLP | Motley Rice LLC |
| 140 Broadway | 600 Third Avenue, Suite 2101 |
| New York, NY  10005 | New York, NY  10016 |
| (212) 907-0700 | (212) 577-0040 |
| gasciolla@labaton.com | mbuchman@motleyrice.com |
| | |
| Elizabeth J. Cabraser, Esquire | James R. Dugan, II, Esquire |
| Lieff Cabraser Heimann & Bernstein LLP | The Dugan Law Firm, APLC |
| 275 Battery Street, 29th Floor | 365 Canal Street, Suite 1000 |
| San Francisco, CA  94111-3339 | New Orleans, LA 70130 |
| (415) 956-1000 | (504) 648-0180 |
| ecabraser@lchb.com | jdugan@dugan-lawfirm.com |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Jayne A. Goldstein, Esquire
Shepherd Finkelman Miller & Shah, LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
(886) 849-7545
jgoldstein@sfmslaw.com

Joseph R. Saveri, Esquire
Joseph Saveri Law Firm, Inc.
555 Montgomery Street, Suite 1210
San Francisco, CA  94111
(415) 500-6800
jsaveri@saverilawfirm.com

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
(612) 339-6900
hmsilton@locklaw.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
azapala@cpmlegal.com

Mindee J. Reuben, Esquire
Lite DePalma Greenberg, LLC
1835 Market Street, 27th Floor
Philadelphia, PA  19103
(267) 314-7980
mreuben@litedepalma.com

Dena C. Sharp, Esquire
Girard Sharp LLP
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800
chc@girardsharp.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
(415) 633-1908
bsweeney@hausfeld.com

**End-Payer Plaintiffs' Steering Committee**

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April, 2019, the foregoing Consolidated Amended End-Payer Class Action Complaint was filed with the Clerk of Court who will electronically enter this filing on the docket.  Thereafter, via ECF notifications, the filing will be served on all interested parties registered for electronic filing and be available for viewing and downloading from the Court's ECF system.


Roberta D. Liebenberg